# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00382-CV

### T. L., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-17-007178, THE HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

T.L., herein "Thomas," appeals the trial court's decree terminating his parental rights to his daughter "Janet" who was ten years old at the time of the bench trial.[1] Thomas contends that the evidence was legally and factually insufficient to support the trial court's findings that five statutory grounds existed for terminating his rights and that termination was in Janet's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), (N), (Q), (b)(2). We will affirm the trial court's decree.

### STANDARD OF REVIEW

To terminate the parent-child relationship, the Family Code requires the factfinder to find by clear and convincing evidence that (1) the parent has engaged in conduct set out as a statutory ground for termination and (2) termination is in the child's best interest. *Id.*

---

[1] We will refer to the child and other family members involved in this case by pseudonyms. *See* Tex. R. App. P. 9.8.

§ 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Clear and convincing evidence is the level of proof "that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

When reviewing the legal sufficiency of the evidence in a termination case, we consider all the evidence in the light most favorable to the trial court's finding and determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). This includes assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence, we view all of the evidence in a neutral light and determine whether a reasonable factfinder could have formed a firm belief or conviction that a given finding was true. *See C.H.*, 89 S.W.3d at 18–19. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable person could do so, and we disregard evidence that a reasonable factfinder could have disbelieved or found incredible. *See J.F.C.*, 96 S.W.3d at 266. Evidence is factually insufficient only if a reasonable factfinder could not have resolved the disputed evidence in favor of its finding and if that

2

disputed evidence is so significant that the factfinder could not reasonably have formed a firm belief or conviction that its finding was true. *Id.*

## FACTUAL SUMMARY

The Department of Family and Protective Services removed Janet and her one-month-old brother from their mother's care on November 25, 2017, and filed a petition for parental rights' termination and/or managing conservatorship of the children.[2] The Department attached to its petition the affidavit of CPS investigator Anna Sallows, who averred that the Department removed the children because they were in "immediate danger" due to their mother's appearing with them at a restaurant late at night "disoriented and out of it," possibly due to drugs or a mental-health crisis. Unbeknownst to the Department, Thomas was incarcerated in Georgia when it removed the children from their mother's care and filed its petition.

The bench trial occurred in May 2019, at which a Department caseworker, a Court Appointed Special Advocate (CASA) volunteer, and a CASA supervisor testified. Thomas also testified via telephone from prison and the children's attorney *ad litem* made representations to the court about their best interests. The trial court admitted two exhibits: Sallows's removal affidavit and a copy of the October 9, 2013 judgment of conviction from the Superior Court of Candler County, Georgia, sentencing Thomas to eight years' confinement in state prison for the felony offense of possession of cocaine and the misdemeanor offenses of possession of marijuana, fleeing from law enforcement, and driving without a license.

---

[2] The petition sought to terminate the parental rights of Thomas, the children's mother, and the father of Janet's brother. Neither the children's mother nor the father of Janet's brother is a party to this appeal, and the termination of their respective parental rights is not at issue here.

Caseworker Shatalya Shield testified that the Department was unable to locate Thomas at the beginning of this case and conducted a diligent search for him. The trial court took judicial notice of the diligent-search reports the Department filed on November 28, 2017. Shield testified that the Department first discovered Thomas's whereabouts and mailing address in September 2018, when it learned that he was in Ware State Prison, Georgia, and that it sent him parenting packets and a family plan of service in October 2018. After receiving no response from Thomas, the Department resent him the information in February 2019 but again received no response. Shield testified that to her knowledge Thomas had never sent Janet any letters or gifts or inquired about her well-being or whereabouts.

Shield testified that for some indeterminate period before this case, Janet had lived with Thomas and her paternal grandmother in Georgia. That period ended when Thomas and the paternal grandmother "ask[ed] mom to come get [Janet] because of [her] behavioral issues." She said that during the pendency of this case, Janet found her paternal family and father on Facebook and "reached out" to them on the site. Shield testified that Janet had expressed wanting to live with her foster parents since the beginning of the case until shortly before trial when, after speaking with her paternal grandmother over the phone, she expressed a new desire to live with her paternal grandmother.

Shield explained that an ICPC (Interstate Compact on the Placement of Children) home study for Janet's paternal grandmother was pending in Georgia, but that the Department's current recommendation was that Janet and her brother be adopted by their foster family. She explained that she had concerns about separating Janet and her little brother, who were very bonded, and that the foster family was able and willing to adopt both children. She said that the foster family was willing to allow the children to have post-adoption contact with their biological

4

families. Shield acknowledged that the paternal grandmother expressed a willingness to have Janet live with her and that the Department was awaiting the results of the ICPC home study before deciding whether Janet would be able to live with her paternal grandmother.

Thomas testified that he first became aware of this case in September 2018 when his court-appointed attorney contacted him. He said that he provided his counsel the name of his mother as a potential placement for Janet and requested through counsel that his mother undergo an ICPC home study. He hoped Janet would be placed with his mother. He said that he last saw Janet in 2016 when she and her mother came from Texas to Georgia and that, after Janet left Georgia with her mother a couple months later, he had trouble keeping in contact because Janet's mother "changed her social media accounts frequently." He explained that, while he wanted Janet to remain with him, he allowed her to leave Georgia with her mother because "her momma was [Janet's] best friend" and Janet wanted to stay with her. He testified that he had heard rumors that Janet's mother was "jumping from house to house" and did not have stable living arrangements and that he thought she was "lying to [his] face" about being good, straight, and stable. Nonetheless, he allowed Janet to leave Georgia and return to Texas with her mother.

Thomas further testified that, prior to 2016, the last time he saw Janet was in 2009, the year she was born. He explained that Janet, her mother, and he had lived with his mother until the end of 2009, when Janet and her mother left Georgia. He testified that he had been working during that year and providing Janet support. He said that he has seen Janet a total of "twice in her life"—in 2009 and 2016. He explained that he was currently in prison due to a parole violation in September 2018—a "residential technicality"—because he did not properly inform his parole officer of his new address. Before the violation, he had been on parole for about two years. He did not know when his next parole date was, but his maximum release date

5

is August 2021.  The original criminal charges for which he was convicted were brought against him in 2011.

Thomas testified that during his approximate two years on parole, he provided financial support for Janet "one time" in the amount of $400 in response to Janet's mother's request that he wire her some money.  He did not testify about any further financial support he has provided for Janet, although he had been working two jobs during the time he was on parole, making close to $1000 per month.  He also testified that since learning about this case, he sent one letter to Janet, through CASA, and has not made any phone calls to her.  He said that the last time he talked to Janet on the phone was in 2016.  He explained that after Janet and her mother left Georgia in 2016, he had trouble keeping in contact with Janet but never sought help from the police in locating her and never filed for any custody rights.

Thomas testified that he never received any phone calls, packets, or letters from the Department but has received "about weekly" phone calls from his counsel.  He said that he received correspondence from CASA and sent a letter in response, asking CASA "to get in touch with my daughter to have her [] write me or send pictures and letters and that I love her, and I will get her one day, when I get out of here."

CASA volunteer Elana Schulman testified that when she first met the children, in December 2017, Janet was having behavioral issues—outbursts, trouble sleeping, and general agitation.  She said that Janet is "a completely different child now," well adjusted and "seemingly normal."  She explained that Janet and her brother are thriving in their current foster home and that Janet is getting good grades and engaged in after-school activities.  She said that Janet has been in therapy and is currently on psychotropic medication.  Schulman said that when Thomas was assigned an attorney, CASA was able to locate his mailing address and sent him a letter in

6

January 2019, to which he responded. Thomas's letter "stated concern" for Janet and asked CASA to reach out to his mother. Apart from Thomas's letter in response, Schulman was not aware of any other letters that Thomas sent, either to CASA or to Janet herself. Schulman also testified that she was aware of one phone call between Thomas and Janet, in the spring of 2018, after Janet used her foster mother's cell phone to find her paternal family members on Facebook.

Schulman testified that she believed it was in Janet's best interest to terminate Thomas's parental rights because the child "does not have a significant relationship" with him and the foster home is able and willing to adopt her and her brother, providing the children the permanency and stability they need, especially with the "many traumas" that Janet has suffered and the amount of caretaking she will need. She testified that Janet's foster mother is an "unbelievable advocate" for her at school, sitting in on her classes "to make sure that she's behaving," having daily contact via text with her teachers and counselors, and being at the school frequently. Schulman stated that Janet never asked her about her paternal family and was "nonchalant" about them when Schulman mentioned them. She said that Janet "really didn't care about her [paternal grandmother] or the relationship" until the recent phone call that she had with her paternal grandmother. Janet also told Schulman that she had been "very uncomfortable" during the short period she had lived with her paternal grandmother.

CASA supervisor Erin Taylor testified that she did not feel Thomas had maintained a significant relationship with Janet because he has not had contact with her since 2016; he did not contact CASA via phone or letter since his initial response letter, despite CASA providing him with its contact information; and none of his family had reached out to Janet after her initial phone call to them after finding them on Facebook. She explained that CASA's position was that, other than the initial response letter, Thomas has not taken any actions

7

demonstrating his desire to be involved in Janet's life. She testified that CASA attempted to reach Janet's paternal grandmother in the fall of 2018 and was able to speak with her after several attempts. She said that she believed it was in Janet's best interest for Thomas's parental rights to be terminated.

Janet's attorney *ad litem*, Robert Galvin, represented to the court that until the eve of trial, Janet had consistently told him that she wanted to remain with her brother and with her foster family if she could not be with her mother. Galvin explained that the day before trial, "things kind of took a turn a little" when Janet was "very clear that she wanted to go live with her paternal grandmother," to whom she had spoken on the phone the week before. Janet expressed her belief that if she lived with her paternal grandmother, she would be able to see her father and visit her little brother. Galvin explained that he did not think Janet had a "grasp of the termination concept." He explained that he believed adoption would be best for Janet, whether by the foster family or her paternal grandmother, because she would then be entitled to receive post-adoptive services and "will need therapeutic intervention . . . long after [the Department] is out of her life."

**DISCUSSION**

In his first through fifth issues, Thomas contends that the evidence is legally and factually insufficient to support the trial court's findings that he engaged in conduct satisfying five of the statutory grounds supporting termination by: (1) knowingly placing or allowing Janet to remain in conditions or surroundings that endangered her physical or emotional well-being; (2) knowingly engaging in conduct or placing her with persons who engaged in conduct that endangered her physical or emotional well-being; (3) failing to support her in accordance with

8

his ability during a period of one year ending within six months of the date of the petition's filing; (4) constructively abandoning her; (5) and knowingly engaging in criminal conduct that has resulted in his conviction, confinement, and inability to care for her for at least two years from the petition's filing. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), (N), (Q). In his sixth issue, Thomas challenges the evidentiary sufficiency supporting the trial court's finding that termination of his rights was in Janet's best interest. *See id.* § 161.001(b)(2).

### *Subsection E finding*

We first consider the trial court's finding that Thomas "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Subsection E requires proof of child endangerment, i.e., exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment need not be established as an independent proposition but may be inferred from parental misconduct. *Id.* Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Conduct" under subsection E includes omissions and failures to act, *In re J.T.J.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.), and imprisonment is "certainly a factor to be considered by the trial court on the issue of endangerment," *Boyd*, 727 S.W.2d at 533. Additionally, conduct that "subjects a child to [a] life of uncertainty and instability endangers a child's physical and emotional well-being." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A parent's lengthy absence from a child's life can be conduct that endangers

9

the child's emotional well-being, *see In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding that father's drug dealing and lengthy incarceration, leaving "emotional vacuum" in child's life, was endangering conduct), and a factfinder may infer that a parent's lack of contact with the child and absence from the child's life endangered the child's emotional well-being, *see In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

The record conclusively shows that, while Janet was very young, Thomas engaged in drug-related criminal conduct resulting in a felony conviction and an eight-year prison sentence, which he was still serving at the time of trial. Although he was released on parole in 2016 and spent some time outside of prison, evidence showed that he violated his parole, was reincarcerated, would remain incarcerated until 2021, and was not aware of another parole release date. The record also shows that Thomas saw Janet for only two periods over her ten years of life, once for about a year after she was born and then again for a couple months while he was on parole, after which he allowed Janet to return to Texas under her mother's care despite having concerns about the stability of her mother's living arrangements. Evidence showed that Thomas did not maintain significant contact with his daughter at any time over the years—by phone, letter, or otherwise—and did not attempt to exercise his parental rights or have visitation or a meaningful relationship with her except for one letter he sent to CASA asking about Janet. Evidence also showed that Thomas did not provide financially for Janet except for a one-time payment to her mother of $400. No evidence was presented that Thomas made any arrangements for another person to provide care for Janet on his behalf during his incarceration.

Considering all of the evidence, including Thomas's criminal conduct, incarceration, failure to financially or emotionally support Janet, lengthy absence from the

child's life, and acquiescence in her placement with her mother despite his suspicion that she could not provide a stable and secure environment, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Thomas's conduct jeopardized Janet's emotional or physical well-being. *See J.F.C.*, 96 S.W.3d at 266. Furthermore, there was no significant disputed evidence that would render such finding unreasonable. *See id.* Because the evidence was legally and factually sufficient to support the trial court's finding under subsection E, we need not address Thomas's remaining issues contesting the trial court's other statutory predicate findings. *See In re N.G.*, 577 S.W.3d 230, 235, 239 (Tex. 2019) (per curiam) (requiring appellate courts reviewing termination findings that are based on subsection D or E to ensure that evidence is sufficient to support at least one of those two grounds because finding under either could be used in future proceedings to terminate parent's rights to other children); *A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 698–99 & n.2 (Tex. App.—Austin 2019, pet. filed) (noting that when appellant challenges both subsection D and E findings, appellate court needs to ensure that evidence is sufficient to support either ground); *see also* Tex. Fam. Code § 161.001(b)(1)(M) ("The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E).").

### *Best-interest finding*

We next consider Thomas's complaint that the evidence is legally and factually insufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code § 161.001(b)(2). A factfinder's best-interest determination is reviewed in light of the non-exhaustive list of

considerations set out in *Holley v. Adams*: the child's wishes, if the child is of an appropriate age to express such wishes; the child's present and future emotional and physical needs; present and future emotional and physical danger to the child; the parenting abilities of the individuals seeking custody; programs available to assist those people to promote the child's best interest; plans for the child by the people or agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the parent-child relationship is improper; and any excuse for the parent's acts or omissions. 544 S.W.2d 367, 371–72 (Tex. 1976).

The Department is not required to prove all of the *Holley* factors "as a condition precedent to parental termination," and a lack of evidence of some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. Evidence presented to satisfy a predicate statutory-ground finding may also be probative of the child's best interest. *Id.* at 28. We summarize the evidence bearing on only those *Holley* factors on which there is relevant evidence in the record.

Janet did not testify at trial, but Shield, Schulman, and Galvin spoke to the issue of her desires. Galvin and Shield stated that for some time before trial, Janet had expressed a desire to live with her foster parents. However, shortly before trial and after a phone call with her paternal grandmother, Janet told Galvin and Shield that she wanted to live with her paternal grandmother and expressed to Galvin her belief that if she lived with her paternal grandmother, she would still be able to visit her little brother, with whom she was very bonded. Shield testified that the foster family was willing to adopt both children. Adoption of both children by the foster family would guarantee Janet's continued contact with her brother. Schulman testified

12

that Janet had been "nonchalant" towards her paternal relatives and had reported being "very uncomfortable" living with them during the short period of time that she spent with them in Georgia in 2016.

"The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). Evidence showed that when she came into the care of the Department, Janet demonstrated significant behavioral issues, both at school and in her foster homes, but that her behavior has improved since she was placed in her current foster home due to the stability and structure it has offered and her foster mother's strong advocacy for her at school. According to Schulman, Janet's past trauma and instability mean that she will "require a lot of caretaking," and Galvin similarly believed that Janet would require further therapeutic services, to which she would be entitled if adopted.

Evidence showed that Thomas knowingly returned Janet to her mother's care even though he suspected that she did not have a stable housing situation; violated his parole and was reincarcerated for his prior felony and misdemeanor drug offenses; failed to support Janet financially or emotionally for most of her life; and failed to establish or maintain a meaningful, long-term, and stable relationship with her. A factfinder may infer that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent and may give "great weight" to the "significant factor" of drug-related conduct. *Id.* at *4. Evidence demonstrating past endangerment and drug-related conduct is inextricably linked to a child's best interests.

Thomas explained that he did not receive the Department's parenting packets and family service plan and did not have greater contact with Janet over the years because her mother

13

was difficult to find. However, the trial court could have given little credence to this testimony or weighted other factors concerning Janet's best interest more heavily.

In sum, the evidence showed that Thomas had little to no meaningful relationship or connection to Janet over her ten years of life and did not have contact with her more than two different spans of time; did not provide her financial support; allowed her to return to Texas with her mother despite having suspicions about her mother's stability and fitness to parent; engaged in drug-related criminal conduct during her early years for which he would remain incarcerated for at least two years after this cause began and would be unable to care for Janet; did not seek custody or visitation with her; did not complete parenting packets the Department sent him or otherwise demonstrate an ability or willingness to parent her appropriately; and did not identify a suitable caregiver who has agreed to fulfill his parental duties while he is in prison. Considering the evidence in the light most favorable to the trial court's best-interest finding, we conclude that the trial court could reasonably have formed a firm belief or conviction that termination of Thomas's parental rights was in Janet's best interest. *See J.F.C.*, 96 S.W.3d at 266. Furthermore, there was no significant disputed evidence that would render such finding unreasonable. *See id.* Therefore, the evidence was legally and factually significant to support the trial court's best-interest finding, and we accordingly overrule Thomas's sixth and final issue.

## CONCLUSION

We affirm the trial court's decree terminating Thomas's parental rights to his child Janet.

14

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed:   November 6, 2019